

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL CREGHAN       :      CIVIL ACTION
                           :

v.                     :

PROCURA MANAGEMENT, INC.   :      NO. 14-1847

**MEMORANDUM**

FILED

MAR 09 2015

MICHAEL E. KUNZ, Clerk

By_____ Dep. Clerk

Dalzell, J.                                            March 9, 2015

     Michael Creghan sued Procura Management, Inc. ("Procura") seeking sales commissions

on business he claims to have originated for Procura under the parties' oral agreement.  Procura

counterclaimed that Creghan violated a non-disclosure, non-solicitation agreement by consulting

for a Procura competitor and contends it owes Creghan nothing.

     Before us are cross-motions for summary judgment.  Creghan has filed a motion for

summary judgment as to Procura's counterclaim and Procura moves for summary judgment or,

in the alternative, partial summary judgment as to the agreement and Creghan's breach of

contract claim.[1]  For the reasons detailed below, we will deny Creghan's motion.  We will grant

Procura's motion in part and deny it in part.

     We have jurisdiction pursuant to 28 U.S.C. § 1332 because Creghan is a Maryland

resident and Procura is a Delaware corporation with corporate offices in Norristown,

Pennsylvania.  Creghan's claim for about $4.6 million in commissions amply satisfies the

---

[1] Creghan abandoned his claims for negligence with regard to the tax liability he incurred, as
well as his equitable claims for promissory estoppel and unjust enrichment, and a state law claim
for violation of the Pennsylvania Wage Payment and Collection law.  He has also abandoned
claims as to commissions purportedly generated by three entities, Consolidated Services Group,
Geico New York and Horizon Casualty Services (the latter two being accounts that never came
to fruition).  See Pl. Br. in Opp. at 52, 53.  We will therefore grant defendant's motion for partial
summary judgment as to those Counts.

amount in controversy requirement.

## I.   <u>Legal Standard</u>

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A party moving for summary judgment bears the burden of proving no genuine issue of material fact exists. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 n. 10 (1986).  To that end, the movant must inform the district court of the basis for its argument by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Where the movant is the defendant or the party that does not have the burden of proof on the underlying claim, it "has no obligation to produce evidence negating its opponent's case," <u>National State Bank v. Federal Reserve Bank of New York</u>, 979 F.2d 1579, 1582 (3d Cir. 1992).  The movant need only point to the lack of evidence supporting the non-movant's claim.  <u>Id.</u>

The reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  <u>Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.</u>, 470 F.3d 535, 538 (3d Cir. 2006).  We must resolve all doubts in favor of the non-moving party.  <u>Woodside v. Sch. Dist. of Phila. Bd. of Educ.</u>, 248 F.3d 129, 130 (3d Cir. 2001).  A factual dispute is "genuine" if it turns on "evidence on which the jury could reasonably find for the plaintiff."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." <u>Id.</u> at 248.  That is, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude" summary judgment.  <u>Boyle v. County of Allegheny</u>

Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Anderson, 477 U.S. at 248).   The

court's function is not to make credibility determinations, weigh evidence, or draw inferences

from the facts.  Anderson, 477 U.S. at 249.

When both parties move for summary judgment, our task is no different.  As our Court of

Appeals has cautioned,

> Cross-motions are no more than a claim by each side that it alone
> is entitled to summary judgment, and the making of such
> inherently contradictory claims does not constitute an agreement
> that if one is rejected the other is necessarily justified or that the
> losing party waives judicial consideration and determination
> whether genuine issues of material fact exist. If any such issue
> exists it must be disposed of by a plenary trial and not on summary
> judgment.

Rains v. Cascade Industries, Inc., 402 F.2d 241, 245 (3d Cir. 1968).

Cross-motions must be considered separately and should not be interpreted necessarily to

mean that judgment should be entered on either one of them.  Each party, as a movant for

summary judgment, bears the burden of establishing that no genuine issue of material fact exists

and that he is entitled to a judgment as a matter of law.  10A Charles Alan Wright and Arthur R.

Miller, Federal Practice & Procedure, §2720 (3d ed. 2014).  As in any summary judgment

motion, the determination whether a genuine issue concerning a material fact exists is itself a

question of law that the Court must decide.  It does not depend upon what either or both of the

parties may have thought about the matter.  A party moving for summary judgment concedes the

absence of a factual issue and the truth of the non-moving party's allegations only for purposes of

his own motion.  Id.  As Wright and Miller observe, "It follows that the legal theories the movant

advances in support of a Rule 56 motion and the assertion that there is no issue of material fact

may not be used against the movant when the court rules on his adversary's motion."  Id.

It is well-established that Rule 56 obliges the non-moving party "to go beyond the

pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Celotex, 477 U.S. at 324; see also Fed. R. Civ. P. 56(c). To prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].' " S.H. ex rel. Durrell v. Lower Merion School Dist., 729 F.3d 248, 256 (3d Cir. 2013) (quoting Anderson, 477 U.S. at 252) (internal citation omitted).

If the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex, 477 U.S. at 322. Specifically, Fed. R. Civ. P. 56(e) provides in relevant part that "[i]f a party fails to properly . . . address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it."

Because we consider cross-motions before us, "[t]he fact that one party fails to satisfy that burden on his own Rule 56 motion does not automatically indicate that the opposing party has satisfied his burden and should be granted summary judgment on the other motion." 10A Wright & Miller at §2720. Both motions must be denied if we find there is a genuine issue of material fact, but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court may render judgment. Id.

## II.    Factual and Procedural Background

Procura is a managed care company that markets medical bill reviews and claims-related services. Its clients are insurers and self-insuring employers.

4

The parties agree that in March or April of 2003, Creghan and Joseph Fox, then-President

of Procura, entered into an oral agreement under which Creghan would seek new accounts for

Procura's billing review line of business. Pl. Br. in Opp. at 4; see also Def. MSJ, Ex. B (Fox

Dep.) at 55:15-56:12.  Fox and Creghan knew each other well by then.  Creghan had owned a

medical case management business and Fox had been his employee for about seven years before

Fox and his brother, Michael, launched the company that became Procura. Pl. MSJ at 2, 3.  The

oral consulting agreement called for Creghan to receive a $2,500 monthly retainer, expense

reimbursement and a 7% commission on new accounts. [2]  Pl. MSJ, Ex. K, Schedule 3.12(a); see

also Def. MSJ at 6.

It is also undisputed that Creghan brought in several accounts between 2005 and 2007 for

which Procura compensated him.  These included New Jersey Skylands, New Jersey

Manufacturers Insurance Company ("NJM"), Selective Insurance and the company eventually

known as Premier Prizm Solutions ("Prizm").  Amended Complaint ("AC") at ¶¶ 11-14; Def.

MSJ at 9.  In July of 2007, Fox sold Procura to a private investment firm.  Pl. MSJ at 6; Def.

MSJ at 5.  Thereafter, Creghan and Fox, who continued to run Procura briefly, agreed to reduce

Creghan's commission to 5%. AC at ¶ 18; Def. MSJ at 6.  In 2010, Procura unilaterally

decreased Creghan's commission on the NJM account to 3%.  Pl. Br. in Opp. at 23 and Ex. 13

(Fortunato Dep.) at 49:24-50:1; Def. MSJ at 7 and Ex E (Fortunato Dep.) at 49:24-50:1.  After

Procura and Prizm settled a lawsuit, Procura reduced Creghan's commission to 1.5% for that

client.  AC at ¶¶ 24, 27; Def. MSJ at 9.

In January of 2008, Procura and Mitchell International ("Mitchell") entered into a

partnership.  Pl. Br. in Opp. at 12, Def. MSJ, Ex. W.  Mitchell develops and licenses medical bill

---

[2] Creghan contends the 2003 agreement originally called for a 10% commission.  Pl. Br. in Opp.
at 4.  He maintains that 7% was the compromise he and Fox reached in 2005.  Id. at 5.

5

review software for insurance companies and auto insurance-related businesses. Pl. Br. in Opp. at 9; Def. MSJ at 11. Mitchell had been seeking to market its services in New Jersey for several years prior to the 2008 matchup. Pl. Br. in Opp. at 9. The New Jersey market is unique because auto and workers' compensation programs in that state have a significant component of managed care services, which under state law must precertify medical care prior to treatment. Id. at 3. Virtually all of Procura's business is in New Jersey. Id.

The nature of the Procura-Mitchell relationship, and the business Procura gained as a result, are at the core of this dispute. The parties disagree about the role Creghan played in bringing about the Mitchell partnership, how it was structured, and what accounts Creghan originated thereafter for which he claims Procura owes him commissions.

According to Creghan, the Procura-Mitchell venture allowed the companies to access each other's insurance carrier clients through a partnership combining Mitchell's bill review expertise with Procura's PPO networks[3] and managed care services. Id. at 9, 10. Beginning in 2006, Creghan, representing Procura, met and communicated with Mitchell representatives to hash out the terms of the partnership. Id. at 11; see also Ex. 10 (Gilmartin Dep.) at 15:6-17:6. In January of 2008, the companies entered into a Network Access Agreement in which Mitchell's large insurance company customers would be able to access Procura's PPO network and Procura would market Mitchell's bill review software to its clients. Id. at 12; see also Ex. 10 at 23:3-25:3.

According to Creghan, the Network Access Agreement was "only one piece" of the accord he fashioned with John Gilmartin, his counterpart at Mitchell. Id. He states that the partnership included "network services and case management services, with a full medical

---

[3] A "PPO" is a Preferred Provider Organization, a type of health plan that contracts with medical providers to create a network of participating doctors and hospitals.

management module for medical services and a complete solution for New Jersey auto [personal injury] claims" that combined both companies' products. Id. at 12. See also Ex. 10 at 22:11-24:21; Ex. 17 (Rubert Dep.) at 41:22-42:6.

In March of 2008, Creghan and Gilmartin presented the partnership to Mitchell's best customers and prospective clients at a Mitchell company conference. Id. at 13; see also Ex. 20. By this time, Creghan contends, he and Gilmartin had identified significant insurance carriers as new business targets -- including Allstate Insurance ("Allstate") -- which Creghan maintains Procura was able to win as a client only by marketing Mitchell's software. Id. at 14; see also Ex. 10 at 20:15-21:1 and Ex. 17 at 26:19-27:5 and 29:16-30:10. Procura was using a manual bill review system at the time that was unable to handle large volumes of claims without introducing errors. Id. at 15; see also Ex. 11 (Schiele Dep.) at 27:15-21 and 116:20-117:4. Creghan contends that "Allstate in particular required an automated bill review system and . . . had left its prior vendor because [that vendor] lacked an automated system." Id. at 15. Allstate was already using Mitchell in all other 49 states besides New Jersey. Id. Creghan was excluded from all presentations to Allstate at the direction of Joe Fox's brother, Michael. Id. at 16; see also Ex. 17 at 48:20-50:11, 51:17-52:3 and 54:3-8. Nonetheless, he claims that he should receive commissions on the Allstate account because Procura would not have entered into a contract with Allstate without the partnership Creghan forged between Procura and Mitchell. Id. at 14, 16.

Creghan recalls that Allstate became a Procura client in 2010 or 2011. Id. The sales cycle for such business is longer the larger the account -- six months for small clients but as long as twenty-four months for large and sophisticated accounts such as Allstate. See Ex. 10 at 35:25-36:1. He describes the Allstate arrangement as Allstate submitted its medical bills from claims

to Procura and paid Procura directly for bill review PPO services.  Pl. Br. in Opp. at 16.  Procura

used a third party to enter Allstate's medical bills into Mitchell's bill review system.  Id.  Procura

split revenue from its bill review services for Allstate with Mitchell.  Id.  Mitchell and Procura

billed the partnership's clients 20% of the clients' savings on medical expenses and under a

revenue-sharing arrangement, Creghan contends, Mitchell received 5% of the savings and

Procura 15%, no matter which company sourced the business.  Id. at 17.

Creghan also maintains that Procura clients Progressive Casualty Insurance Co.

("Progressive") and New Jersey Property-Liability Insurance Guaranty Association

("NJPLIGA") shifted from doing business directly with Procura to accessing its PPO network

through Mitchell.  Id. at 18.  As a result, he maintains, Procura continued to receive revenue from

those accounts, through Mitchell, on which he argues Procura owes him commissions.  Id. at 19.

In short, he argues that the Procura-Mitchell partnership allowed Procura to acquire and maintain

its relationships with existing clients and enter into new agreements with insurers it could not

have serviced before.  Id. at 14, 15, 17.

He also claims that insurance carriers hired Procura to provide Decision Point Review or

precertification services for their insureds and "at a minimum, all benefitted from the Mitchell-

Procura partnership."  Id. at 17.  Creghan identifies a handful of companies as clients Procura

won through the partnership (collectively, the "Decision Point Review Plan clients").[4]  Id.  He

claims Procura owes him commissions on Decision Point Review Plan accounts.

In addition to his Mitchell-related claims, Creghan alleges that Procura owes him a five

percent commission on NJM because the rate was reduced from five percent to three percent

---

[4] Creghan identifies these entities as "Allstate, Esurance, Kemper, Progressive[,] Tower Group,"
as well as "AutoOne," "Clarendon," "Farm Family," and "Utica" without providing their full
corporate names.  Pl. Br. in Opp. at 17.

without his prior knowledge or consent. Id. at 23. He contends that Procura owes him a commission on its $700,000.00 settlement from Prizm because, he argues, that money represents "debt owed for services provided during the 2009-2010 time period, when [he] was being paid a commission on [Prizm] revenues." Id. at 25, 26. He also seeks commissions on Fair Isaac's business, an account he originated which Mitchell bought soon thereafter, because he contends that Fair Isaac's insurance clients continued to access Procura through Mitchell and Mitchell paid Procura for the carriers' use of its network access. Id. at 13, 14. See Ex. 10 at 37:17-39:4 and 63:16-8.

Procura's version differs sharply. It contends that Creghan is owed nothing on accounts he did not directly bring in. As to the Network Access Agreement between Procura and Mitchell, Procura maintains that it was the "sole written agreement that resulted from the negotiations in which Creghan was involved." Def. MSJ at 11. Under that agreement, which defined the terms under which Mitchell customers could access Procura's PPO network, Mitchell is not a "client" of Procura because Mitchell clients can access Procura's PPO network but are not required to do so. Id. at 12. Procura maintains that the partnership did not generate revenue on its own, but was merely a joint marketing agreement to permit the companies' salespeople to sell to each other's customers. Id. at 20.

> Procura did not pay any commissions on the Mitchell Network
> Access Agreement itself. Instead, commissions were paid to the
> individual who was successful in actually selling Procura's
> services to a Mitchell client and were based on the revenues that
> Procura received from that client, either directly from the client or,
> in the case of network access clients, through Mitchell.

Id. at 21. Procura states that it has a number of clients who access its network through the written agreement with Mitchell and "none of these clients came to Procura as a result of sales efforts by Creghan" -- with the exception of Selective. Id. at 22.

Procura maintains that Creghan knew every month which accounts produced commissions and therefore "has known since March 2008 that he was not receiving commissions on any Mitchell account other than Selective." Id. at 23.  Procura observes that Creghan first raised the issue of commissions on Mitchell accounts in 2012 when Joe Fortunato, Senior Vice President of Finance at Procura, sought to renegotiate the Selective commission downward. Id. at 23.

Procura contends that Allstate, Progressive and NJPLIGA are not Mitchell-related accounts. Id. at 25, 26.  It maintains that Progressive has been a Procura client since 2005 and that Allstate became a direct Procura client in September of 2010 after "a lengthy [process that] involved many people." Id. at 26.  Procura insists that Allstate wanted to deal exclusively with Procura rather than contract with Mitchell, even though it used Mitchell's software. Id. at 27. "Creghan was not involved in any way in the [request for proposal] presented to Allstate or the subsequent sales, presentations, meetings and negotiations." Id. (emphasis in original).  No Allstate revenue flows through Mitchell. Id. at 28.  The only related fees Mitchell receives in relation to Allstate are those Procura pays for licensing its software. Id.

As to NJM, Procura contends Creghan acknowledged and agreed to the commission reduction and cashed the checks he received thereafter. Id. at 7.  Procura also contests Creghan's claim to a commission on the $700,000.00 Prizm settlement, which constitutes a compromise amount received in litigation rather than revenue. Id. at 8 n. 5.

Procura maintains Creghan has no claim for commissions on clients using its New Jersey Decision Point Review Plan, a service it contends "has nothing to do with Mitchell's Decision Point Review software" despite the similarity in names. Id. at 23, 24.  Some of the disputed clients for whom Procura provides services pursuant to Decision Point Review Plans also access

the Procura network through the Mitchell Network Access Agreement, but others do not. Id. at

24, 25. Procura contends that the undisputed evidence is that Creghan had no involvement in

bringing the Decision Point Review Plan clients to Procura and that these accounts are not

"Mitchell-related accounts." Id. at 41.[5] It seeks summary judgment as to all these accounts

because, it argues, Creghan has failed to proffer any evidence to the contrary. Id.

The parties also dispute whether Creghan is bound by a 2003 "Consultant Non-

Disclosure, Assignment of Developments, and Non-Solicitation" agreement (the "ND/NS

agreement") that he signed at Fox's behest in 2003. Def. MSJ at 4. Procura contends he

breached that agreement and it owes him nothing after he was terminated. Id. at 37. Creghan

contests the agreement's validity because no one from Procura signed it. Pl. MSJ at 11. He

argues that it is void for lack of consideration and is unenforceable because it was not assigned to

the new corporation following the 2007 merger. Id. at 11, 15, 18, 20.

Friction arose between the parties after the Commonwealth of Pennsylvania audited

Procura in 2011 and classified Creghan as an employee rather than an independent contractor.

As a result of the Commonwealth's audit, Creghan was audited and paid a settlement to the

Internal Revenue Service. Id. at 8.[6] Creghan unsuccessfully sought a written agreement with

Procura to forestall personal tax issues. Pl. MSJ at 8. Procura terminated its consulting

---

[5] Like Creghan, Procura does not identify these disputed clients by their full corporate names. In
its motion for summary judgment, it identifies AutoOne, Esurance, Kemper, NGIC, and
TowerGroup/NJSIA as Decision Point Review Plan clients who accessed the Procura network
through the Mitchell partnership and separately identifies NJPLIGA, Clarendon, Utica, Farm
Family, Progressive and Praetorian as Decision Point Review Plan clients who are "not Mitchell-
related clients." Def. MSJ at 24. Finally, IFA, Farmers Insurance and NL&F are Procura clients
who do not access its network through the Mitchell partnership. Id. at 25.

[6] The parties agree that Procura always dealt with Creghan as an independent contractor. Pl.
MSJ at 3; Def. MSJ at 5.

11

arrangement with him as of February 28, 2014. [7] See id. at Ex. O (Feb. 26, 2014 letter from Thomas Dare, general counsel of Healthcare Solutions, Procura's corporate parent, to Creghan's counsel).

Creghan filed this suit on March 27, 2014.

## III. Discussion

### A. Creghan's Motion for Summary Judgment

In May of 2003, Procura president Fox requested that Creghan sign the ND/NS agreement. Pl. MSJ at 3; Def. MSJ at 4. The terms of the purported ND/NS agreement prohibited Creghan, inter alia, from revealing information or trade secrets during or after his employment and from soliciting Procura customers during his employment and for eighteen months after his employment ended. Pl. MSJ at 3; Def. MSJ at 4, 5. The parties do not dispute that Creghan signed the agreement and that no one from Procura signed it. Creghan testified in his deposition that he consulted for Procura competitor Horizon Casualty Services ("Horizon") between April of 2012 and October of 2014 and received $337,000.00 in commissions for procuring accounts for Horizon that were also Procura clients. Def. MSJ at 29, 20; see also Ex. A (Creghan Dep.) at 85:3-86:1, 88:5-89:15, and 244:5-245:5.

Creghan seeks summary judgment on Procura's counterclaim that the ND/NS agreement voids his compensation claim because he maintains there is no evidence that the agreement is valid. Creghan maintains that Procura never signed the agreement or intended the parties to be bound by it. Pl. MSJ at 1, 16. Creghan testified in his deposition that Fox originally asked him to sign an ND/NS agreement after he had begun working for Procura under the oral sales

---

[7] Creghan observes that Procura made no reference to the ND/NS agreement at the time of his termination. Pl. MSJ at 8, 9.

agreement for at least one month. Pl. MSJ at 3, 4. He further testified that soon thereafter Fox told him, "there's really no need for [you] to sign this agreement or for us to have it," to which Creghan responded, "I couldn't agree more." Id. at Ex. G (Creghan Dep.) at 214:17-19. He also maintains the ND/NS agreement is void for lack of consideration because he received no new consideration to sign it. Pl. MSJ at 18.

He contends that if there were such an agreement, it did not survive the 2007 merger. Id. at 1. The merger agreement schedules purported to list all of Procura's material contracts, particularly those containing restrictive covenants on employees, but do not list the ND/NS Agreement. Id. at 12. "The oral agreement between Creghan and Procura was specifically identified in the [m]erger [a]greement, but absolutely no reference was made to the ND/NS [a]greement, unequivocally demonstrating that Procura did not consider it to be a valid enforceable agreement." Id. He also testified that Fortunato told him that any documents signed before the 2007 sale were irrelevant. Id. at Ex. G at 215:11-13.

Procura contends in opposition that the ND/NS agreement is binding because Creghan signed it, Fox accepted it on behalf of Procura, and Procura's silence as to that agreement in its 2007 merger agreement is not evidence that it did not intend to bind Creghan to it. Resp. in Opp. at 2-7. Procura also argues that the agreement survives the merger under Pennsylvania law. Id. at 9. Procura states it habitually entered into such accords with its employees. Def. MSJ at 5 n. 1.[8] The company maintains that the agreement is valid because the agreement does not expressly state it is effective only if signed -- and signatures are not dispositive evidence of contractual intent. Id. at 38 n.17.

---

[8] Procura argues that "Schedule 3.12(a) is not an exhaustive memorialization of all the terms of the sales consultancy relationship but is instead simply a summary of the compensation terms of the agreement as they were at the time the schedule was prepared." Def. MSJ at 5 n.1.

13

Procura argues that Fox accepted the agreement on Procura's behalf as a condition of Creghan's service to Procura and the agreement is binding only as to Creghan. See Ex. TT (Decl. of Joseph R. Fox) at ¶¶ 5, 7, 8 ("It was always my intention that Creghan be bound by the terms of the [agreement]"). Fox states the company official in charge of operations and human resources, Kathy Downey, maintained the agreement after Creghan signed it. Id. at ¶ 8. When Creghan filed suit, Fox directed her to produce it in this litigation. See Ex. UU (Decl. of Kathy Downey).

"It is black letter law that in order to form an enforceable contract, there must be an offer, acceptance, consideration or mutual meeting of the minds." Jenkins v. County of Schuykill, 658 A.2d 380, 383 (Pa. Super. Ct. 1995). "In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." Ingrassia Const. Co., Inc. v. Walsh, 486 A.2d 478, 483 (Pa. Super. Ct. 1984). That is to say, a contract exists if a party's overt actions suggest its existence and provide evidence on which a reasonable jury could find the party manifested his intent to form the contact. Id. For that reason, a document signed by only one party may be enforceable "as long as both parties accept and act under its terms." Sullivan v. Allegheny Ford Truck Sales, Inc., 423 A.2d 1292, 1295 (Pa. Super. Ct. 1980).

It is well-established that restrictive agreements such as the ND/NS agreement survive stock mergers. See Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 423 (3d Cir. 2010). ("[B]ased on fundamental principles of commercial transactions and the applicable statutes, we hold that, in contrast to an asset purchase, neither a 100 percent purchase of corporate stock nor a corporate merger affects the enforceability of a noncompete agreement.") (internal citation omitted). An integration clause stating the parties intend the writing to represent their entire

agreement is a "clear sign" the writing "expresses all of the parties' negotiations, conversations, and agreements made prior to its execution." Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004).

As Creghan alone signed the ND/NS agreement, it is enforceable only if both parties acted under its terms. Sullivan, 423 A.2d at 1295. The parties point to outward and objective manifestations to support their respective positions. Creghan relies on the merger agreement, which recorded Procura's valid contracts when the company was sold in 2007. See Pl. MSJ, Ex. K. The merger document described his 2003 agreement with Fox in a specific provision:

> Oral agreement between Procura and Michael Creghan (the "Creghan Agreement") pursuant to which Procura has engaged Mr. Creghan to provide sales consulting and related services to Procura. Pursuant to the Creghan Agreement, Procura pays Mr. Creghan a commission of seven percent (7%) of all revenues generated from accounts originated by Mr. Creghan, and reimburses Mr. Creghan for all expenses incurred by Mr. Creghan in connection with the sales consulting and related services he provides to Procura, on a monthly basis. Mr. Creghan focuses his sales efforts principally on obtaining new accounts with respect to Procura's billing review line of business.

Id., Schedule 3.12(a)(1)(d)(i).[9] The merger agreement mentioned no other agreement between Creghan and Procura. Pl. MSJ at 6. It also omitted Creghan's name from the list of fifty-three Procura employees with contracts restricting their business activity. Id. at 6, 7; see also Ex. K, Schedule 3.12(a)(4)(a)(i)-(liii) and 3.12(a)(6). Creghan points us to the description of 3.12(a) as "a complete and accurate list of each Contract to which Procura. . . is a party." Ex. K at 36. He also relies on the integration clause describing the sales contract as "a complete and exclusive statement of the terms of the agreement between the parties." Id. at 65.

We view the facts in the light most favorable to Procura, the non-moving party, and draw

---

[9] Neither party points us to a definition of the term "originate" as used in this agreement.

all reasonable inferences in its favor. As the non-moving party, Procura must designate specific facts showing there is a genuine issue for trial. Procura's Fox testified that he intended Procura to be bound by the unsigned ND/NS agreement. Mem. in Opp. at Ex. TT. In 2003, the year in which Creghan signed the agreement, Fox gave it to the company official responsible for overseeing such employee agreements. Id.; see also Ex. UU. When Creghan filed suit, that official retrieved the agreement in discovery. Ex. UU at ¶ 3.

We need not consider Creghan's other arguments contesting the ND/NS agreement's validity because Procura's evidence unquestionably raises genuine issues for trial as to its existence and validity. Procura's evidence -- the declarations of its former president and its human resources manager, both of whom testified to familiarity with the ND/NS agreement -- unquestionably constitutes specific facts showing that there is a genuine issue for trial. The facts Procura offers are material because they might affect the outcome of the suit under the governing law by persuading a jury of the existence and validity of the ND/NS agreement. This dispute precludes summary judgment because it turns on contradictory evidence on which a jury could reasonably rely to find for either party.

Accordingly, we will deny Creghan's motion for summary judgment as to Procura's counterclaim concerning the existence and validity of the ND/NS agreement.

**B.      Procura's Motion For Summary Judgment Or Partial Summary Judgment**

We turn to Procura's motion for summary judgment or, in the alternative, for partial summary judgment as to Creghan's remaining claim for breach of contract. Procura makes five arguments in support of its motion: (1) Creghan cannot claim a breach on accounts for which he received a commission because he has waived such a breach by accepting checks and cashing them without objection; (2) Creghan has no breach-of-contract claim for commissions after his

16

February 28, 2014 termination because he materially breached the ND/NS agreement; (3)

Creghan has no claim on Mitchell-related accounts because he did not originate them; (4)

Creghan has no claim on accounts he misattributes to the Procura-Mitchell partnership, including

the Decision Point Review Plan clients; and (5) Creghan's claims are barred by the statute of

limitations. Def. MSJ at 34-44.

A plaintiff establishes a cause of action for breach of contract by pleading (1) the

existence of a contract, including its essential terms, (2) a breach of a duty imposed by the

contract, and (3) resultant damages. Corestates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa.

Super. Ct. 1999) (internal citation omitted).  In general, there is an implication of a promise to

pay for services rendered with the recipient's knowledge. Martin v. Little, Brown and Co., 450

A.2d 984, 987 (Pa. Super. Ct. 1981) ("a promise to pay the reasonable value of the service is

implied where one performs for another, with the other's knowledge, a useful service of a

character that is usually charged for, and the latter expresses no dissent or avails himself of the

service.").  "[I]n the case of a disputed oral contract, what was said and done by the parties, as

well as what was intended by what was said and done by the parties, are questions of fact to be

resolved by the trier of fact[.]" Johnston The Florist, Inc. v. Tedco Const. Corp., 657 A.2d 511,

516 (Pa. Super. Ct. 1995) (internal citation omitted).

### 1.    Waiver

A waiver is the act of intentionally abandoning a known right, claim or privilege. Brown

v. City of Pittsburgh, 186 A.2d 399, 401 (Pa. 1962).  "To constitute a waiver of legal right, there

must be a clear, unequivocal and decisive act of the party with knowledge of such right and an

evident purpose to surrender it." Id.  Once a party has waived a legal right, it cannot undo that

waiver and recapture that right. Waggle v. Woodland Hills Ass'n, Inc., 2012 WL 8679678 at *3

17

(Pa. Cmwlth. Aug. 20, 2012).

Procura contends that Creghan waived his breach of contract claim as to commissions on Selective, NJM and Prizm because he cashed the commission checks without objection and acquiesced to the lowered commission rate. Procura points us to Creghan's March 8, 2012 email exchange with Fortunato, in which Fortunato wrote of the Prizm account, "I am proposing paying you 1.5% of revenue when we bill 12%[,] 1.25% of revenue when we bill 11%[, and] 1.0% of revenue if we bill 10%[.]" See Def. MSJ, Ex. S. Creghan responded, "Fine with me, Thx." Id. Creghan testified in his deposition that he had cashed the checks he received for commissions at those rates. Id., Ex. A at 171:19-24. As to NJM, Procura cites the March 3, 2011 email exchange in which Creghan answered "I didn't know. OK" to Fortunato's reminder that "NJM was changed to 3% back when the contract was re-negotiated." Id., Ex. K.

Creghan avers that contesting his communications with Fortunato constitutes waiver. He relies on Kamco Indus. Sales, Inc. v. Lovejoy, Inc., 779 F. Supp. 2d 416 (E.D.Pa. 2011) (Pollak, J.), in which our late colleague held that Kamco, a commissioned sales representative, did not waive its full commission by accepting commissions at a reduced rate because Kamco continued to make express statements contesting the reduction and took actions that indicated he was not waiving his claims. Creghan states that his actions were not a "clear, unequivocal and decisive act" demonstrating his intentional surrender of his right to reduced commissions on NJM, Prizm and Selective. Pl. Br. in Opp. at 39. He was not made aware of the reductions until after they had occurred and continued complaining about them thereafter. Id.

Kamco does not help Creghan. Creghan merely originated the accounts, unlike the sales rep in Kamco who continued to service his accounts and abided by a noncompetition covenant -- express actions that Judge Pollak found demonstrated the rep's intent not to waive his claims.

18

See Kamco, 779 F. Supp. 2d at 424. Procura argues that we should read Kamco narrowly because Creghan's emails stated "OK" and "Fine with me" and, as to NJM and Prizm, we agree. Although Creghan's emails show he was unaware until after the fact that his commission rate had been reduced, his replies at the time show acquiescence with the evident purpose of surrendering his right to a higher commission rate. In particular, we take note of the March 8, 2012 exchange, which continued after Creghan wrote, "Fine with me, Thx." in agreement with the Prizm rate reduction:

| | |
|---|---|
| Fortunato: | . . . at some point in the near future we should discuss Selective PPO and NJM PPO commissions. NJM drops to 10% in April. We have only been getting 15% on Selective. I'm still paying you 3% on NJM and 5% on Selective. Give it some thought. |
| Creghan: | Ok. Selective connected us to Mitchell. I got 18. We lowered it to get a lot more business[.] At the end of the day[,] I got FairIsaac Smart Advisor and Mitchell. I have never made that case but it is on paper. NJM will be lower. Talk to you soon. Thx for Prizm. |

Pl. Br. in Opp. at Ex. 29. Thus, in response to Fortunato's new rate proposal for the Prizm account Creghan expressed his thanks a second time and also acknowledged the lower rate on NJM that had been in effect since the prior year.

As to Selective, Creghan contends in opposition to defendant's motion that he did not receive "full commissions on the Selective revenue for auditing and DME services." Id. at 38. But he testified in both of his depositions that he was not claiming any further commissions as to Selective he received before his February of 2014 termination. Def. MSJ, Ex. A at 118:3-7; see also 167:9-10 ("I don't really want to bring it up, but I think I was paid properly on Selective.").

As the non-moving party, Creghan bears the burden of raising a genuine issue of material fact as to whether he made a clear, unequivocal or decisive act with the evident purpose of

surrendering his right to higher commissions. He has failed to do so. Creghan's admissions constitute a clear, unequivocal and decisive act surrendering any claim to higher commissions on NJM and Prizm. As to Selective, Creghan has waived his legal right and he may not in his opposition to Procura undo that waiver to revive his claim to commissions as to Selective. We will therefore grant Procura's motion for summary judgment as to NJM, Selective and Prizm.

### 2.    Post-Termination Commissions

Procura also argues that Creghan is not entitled to commissions on revenue Procura received after he was no longer a consultant because he materially breached the ND/NS agreement by entering into a consulting agreement with Horizon Casualty Services, Inc. Def. MSJ at 29, 37, 38. Under Pennsylvania law, a party who materially breaches a contract cannot be awarded compensation for damages resulting from the other party's subsequent refusal to perform under such contract. See Ott v. Buehler Lumber Co., 541 A.2d 1143, 1145 (Pa. Super. Ct. 1998). The question of whether there has been a material breach is ordinarily for a jury, Cameron v. Berger, 7 A.2d 293, 296 (Pa. 1938), but Procura urges us to grant summary judgment because, it contends, "the undisputed facts establish that Creghan materially breached the provisions of the non-solicitation provision of his agreement with Procura." Def. MSJ at 38.

As stated above, Creghan contests the validity of the ND/NS agreement and argues we cannot therefore find that he violated that putative accord as a matter of law. Pl. Br. in Opp. at 43. Creghan contests that Procura is entitled to summary judgment for an alleged violation of the ND/NS agreement. Id. at 40. He points us to Linn v. Employers Reinsurance Corp., 153 A.2d 483 (Pa. 1959), where the defendant agreed in an oral contract to pay insurance agents an annual 5% commission on reinsurance premiums the defendant received from an automobile insurer. "By the terms of the contract," the plaintiffs' work consisted of securing the business,

not collecting premiums or performing any further service, and "was completed upon their aiding in the securing of the business for the defendant." Id. at 484. After twenty-seven years, the defendant sought to terminate the contract by arguing it was a contract that contemplated performance on both sides and therefore terminable at will. Id. at 485. The Pennsylvania Supreme Court disagreed:

> Here the plaintiffs did all they had contracted to do, i. e., they secured the reinsurance business for defendant under an agreement that they receive 5% of the premiums so long as the business continues. There was no requirement that the plaintiffs were to perform any other service. Defendant has thus received full performance from plaintiffs and cannot now be permitted to accept the benefits of its agreement while at the same time repudiate the obligations it assumed and has recognized for twenty-seven years. So long as the fruits of this agreement are enjoyed, the consideration agreed upon must be paid in accordance with the contract under which it was given.

Id. at 485-86. Creghan contends that, like the Linn plaintiffs, he is entitled to his earned commissions on all accounts he originated for as long as those accounts produce revenue for Procura. Pl. Br. in Opp. at 42; see also Pl. MSJ at Ex. K, Schedule 3.12(a)(1)(d)(i)("Pursuant to the Creghan Agreement, Procura pays Mr. Creghan a commission of seven percent (7%) of all revenues generated from accounts originated by Mr. Creghan[.]"). "Procura cannot continue to accept the substantial benefits of Creghan's performance without having to comply with its obligation under the agreement to pay the promised commission[.]" Pl. Br. in Opp. at 42.

Viewing the facts in the light most favorable to the non-moving party and drawing all reasonable inferences in Creghan's favor, Creghan has designated specific facts showing there is a genuine issue for trial. He vigorously contests the validity of the ND/NS agreement by showing that Procura failed to list it in its 2007 merger agreement. And as with the plaintiffs in Linn, his oral contract with Procura required him to "focus[] his sales efforts principally on

21

obtaining new accounts with respect to Procura's billing review line of business," Pl. MSJ, Ex.

K (Schedule 3.12(a)(1)(d)(i)). He was not tasked to provide any follow-on services. Because he

has raised a genuine issue of material fact as to Procura's entitlement to summary judgment on

post-termination commissions, we must deny Procura's motion for summary judgment as to

post-termination commissions.

### 3.    Mitchell-Related Business

Next, Procura contends that the undisputed facts establish that Mitchell is not a Procura

"client" because the Network Access Agreement merely created cross-marketing opportunities

for the two companies. Def. MSJ at 39. While Creghan's efforts to sell this partnership to

potential clients came to naught, Procura maintains others at Procura solicited and won the new

accounts as to Mitchell. Id. at 40. It contests his claim to commissions "on revenue in any way

associated with Mitchell, whether or not he had anything to do with marketing to the actual

client." Id. at 22.

Creghan opposes Procura's motion on several grounds. Pl. Br. in Opp. at 43. Creghan

likens the Mitchell Network Access Agreement to the Prizm agreement, "under which its

insurance company clients made use of Procura's services, and for which Procura received

revenue." Id. at 44. He argues that as the "initial person at Procura" who "worked closely with

Mitchell representatives for two years to establish the partnership," id., he is entitled to

commissions on the revenue from clients Procura would not have otherwise obtained. Id. at 45.

He highlights Paul Schiele's deposition testimony, then Procura's Vice President of Information

technology:

> Q:     Would you say that Mr. Creghan was successful in
>        establishing contacts with potential accounts?
> A:     For sure. Yeah.

22

| Q: | Was there anybody at Procura that you felt was establishing as many contacts with substantial accounts as Mr. Creghan was? |
| A: | No. In fact, I remember at one point, I forget who we were joking around with. But of course everybody used to think that Mike was crazy, but we used to say look at the top five. And it was either two or three of the top five were his accounts. |
| | . . . |
| Q: | Who were the others in the top five? |
| A: | I'm sure PLIGA was in there. Um, at this time I think this was before Allstate that I'm referencing. So I wouldn't consider Allstate as being in there at that time. |
| Q: | Allstate subsequently became one of them? |
| A: | I'm guessing Allstate is probably their number one now. |

Id. at Ex. 11 (Schiele Dep.) at 31:16-32:20. Creghan also draws our attention to Melissa

Rubert's deposition testimony, then Procura's Vice President of Medical Billing, that Procura

would not have gotten the contract with Allstate without the partnership Creghan established

between Procura and Mitchell. Id. at Ex. 17, 62:1-11.

That others received commissions, Creghan argues, is not dispositive when he was

prevented from participating in the Allstate sales effort. Id. at 45 and n.9 ("The terms of any

commission agreement between Procura and [the Procura salesperson paid for the Allstate

account], however, is irrelevant. Creghan's agreement required payment of commissions on any

account he originated which generated revenue to Procura.").[10]

In its reply, Procura contests Creghan's assertion that the Mitchell partnership functioned

like the Prizm agreement. Def. Reply at 2. To begin with, they contend, the Mitchell agreement

(unlike the Prizm agreement) states "[N]othing in this Agreement shall prevent [c]lients from

---

[10] Creghan also seeks to argue that Procura obscures his entitlement to Mitchell-related
commissions by stating Mitchell is not a "client" because the contract refers to "accounts." In
fact, both parties use the terms interchangeably and the terms' use is not dispositive of the issue.

opting to use another network vendor" and "Procura has the right to accept or reject a [c]lient." Id.; see also Def. MSJ at Ex. W. Procura also contends that Creghan knew that he was not receiving commissions on Mitchell-related business since March of 2008, but failed to complain until the March of 2012 email exchange with Fortunato. Id. at 3; see also Def. MSJ at 23.

Procura also disputes that it obtained Allstate as a result of the Mitchell relationship or, indeed, that Allstate is a Mitchell-related account. Id. at 26.

It is well-established that we must resolve all doubts in Creghan's favor as the non-moving party. Our task is not to make credibility assessments or weigh the evidence. Accordingly, we conclude that Creghan has gone beyond the pleadings and offered in support of his claim others' deposition testimony on which a jury could reasonably find that his oral contract for commissions on accounts he "originated" may encompass the business won through the Mitchell agreement, even without his direct involvement in the sales process. We will deny Procura's motion for summary judgment as to the Mitchell relationship and business it derived therefrom.

### 4. Claims as to Allstate Insurance, Progressive Casualty Insurance Co., and New Jersey Property-Liability Insurance Guaranty Association and Other Decision Point Review Plan Clients

Procura next contends that we should grant it summary judgment on accounts that Creghan deems Mitchell-related, but which Procura states are not. Procura states that NJPLIGA became a Procura account in 1998 and Creghan was not involved in persuading it to use Procura's services. Def. MSJ at 25. Similarly, Procura maintains that Progressive has been a Procura client since 2005. Id. at 26. As to Allstate, "Procura has had a direct contractual relationship with Allstate since September 2010" as a result of what it terms a lengthy sales process that started with a Request for Information to Procura. Id. Thereafter, Procura was

24

invited by Allstate to a meeting in Chicago before which "Allstate made it clear that it did not want to contract with Mitchell." Id. at 27. Mitchell did not attend the initial meeting in Chicago although it eventually served as the IT subcontractor for Procura on the Allstate account. Id. Procura maintains that Allstate pays it directly: "no revenues related to services provided by Procura to Allstate flow through Mitchell." Id. at 28. Procura argues that "the undisputed evidence establishes that Allstate, Progressive, NJPLIGA" as well as its Decision Point Review Plan clients "are not Mitchell-related accounts." Id. at 41. It contends that Creghan has failed to offer any evidence to support his entitlement to commissions (and, in the case of NJPLIGA and Progressive, conceded no involvement in bringing them to Procura, id. at Ex. A, 105:4-7). Procura urges us to grant it summary judgment as to Creghan's breach of contract claim with respect to these accounts.

Creghan opposes Procura's motion. As to Allstate, we addressed his arguments above. As we also stated above, we must resolve all doubts in Creghan's favor as the non-moving party and not make credibility assessments when the critical meaning of the term "originated" remains ambiguous. Creghan has gone beyond the pleadings and presented third party deposition testimony based on which a jury could reasonably find that his contract for commissions encompassed such accounts as Allstate.

But that is not the case with NJPLIGA, Progressive and Procura's clients for its Decision Point Review Plan. Creghan counters that NJPLIGA terminated its contract with Procura in 2012 and is now a Mitchell client and that Procura continues to receive revenue from NJPLIGA through Mitchell "because of the Mitchell-Procura partnership" he established. Pl. Br. in Opp. at 46; see also Ex. 3 (Creghan Decl.). Likewise, he maintains that Progressive terminated its Procura contract in December of 2013 and is a Mitchell customer. Id. at 18; see also Ex. 10 at

25

41:22-42:25. But Creghan fails to present more than a mere scintilla of evidence on which a jury could reasonably find for him. His assertion about NJPLIGA rests solely on his self-serving declaration. And his contentions about Progressive[11] and Procura's other Decision Point Review Plan clients -- equally insubstantial -- derive from a Mitchell executive's characterization of these clients as current or past clients. See Pl. Br. in Opp. at 17. Such passing mention is not enough evidence on which a jury could reasonably find for Creghan on his breach of contract claim for commissions as to those clients. We will therefore grant Procura's motion for summary judgment as to NJPLIGA, Progressive and the other Decision Point Review Plan clients.

### 5.    Statute Of Limitations

Finally, Procura argues that Creghan's claims are barred by Pennsylvania's four-year statute of limitation for breach of contract claims. See 42 Pa. Cons. Stat. Ann. § 5525(a)(3).

It is well-established that federal courts apply state law to determine when an action accrues for the purposes of the statute of limitations in matters arising under state law. Ragan v. Merchants Transfer & Warehouse Co., 337 U.S. 530, 533 (1949) (cited in Baird v. Marley Co., 537 F. Supp. 156, 157 (E.D.Pa. 1982)). "The statute of limitations begins to run at the time the cause of action accrues. Under Pennsylvania law, in an action for breach of contract, the action accrues when the contract is breached." OneBeacon Ins. Co. v. Aviva Ins. Ltd., 2013 WL 2147958 at *4 (E.D.Pa. May 17, 2013) (DuBois, J.) (internal citations omitted).

---

[11]As to Progressive, Creghan states that "Procura refused to turn over documents or information concerning revenue received directly from Progressive revenue or payments it received from Mitchell with regard to Progressive's payments to Mitchell." Id. at 46. On January 26, 2015, we denied his motion to compel as to Progressive because he offered no evidence that but for his intervention the Progressive business that Procura sourced without him in 2005 would have disappeared.

Procura argues that the statute began to run in March of 2008, when Creghan concedes he was aware that he was not receiving commissions on Mitchell accounts.  Def. MSJ at 42.  <u>See also</u> Ex. A at 110:6-9 (Q:  "You have known since March 2008 that you at least weren't receiving any commission on any Mitchell account.  Correct?"  A: "Yes.").  Accordingly, it urges us to adopt the reasoning in <u>Ryncavage v. American Family Life Ins. Co. of Columbus, Inc.</u>, C.A. No 3:06-1711 (M.D.Pa. Sept. 13, 2007), <u>aff'd</u>, 293 F. App'x 122 (3d Cir. 2008).  In <u>Ryncavage</u>, an independent contractor sued for breach of contract on August 31, 2006, more than four years after receiving the defendant's July 30, 2002 letter notifying him that it would cease to pay him commissions on new and renewal business.  Our sister court held that the statute of limitation began to run when the plaintiff first received notice that he would not be receiving the commissions, holding that "an independent contractor cannot elect to await payment of commissions that he has not yet earned."  <u>Id.</u> at Ex. RR at 11.  Procura argues that here, as in <u>Ryncavage</u>, Creghan's claim for commissions on Mitchell accounts relates to business from new or existing accounts and he knew more than four years before he brought suit that he would not be paid commissions on that business.  Def. MSJ at 43.

Creghan counters that because his contract with Procura calls for periodic and installment payments, "a separate and distinct cause of action accrues with each failure to make payment." Pl. Br. in Opp. at 50 (quoting <u>Total Control Inc. v. Danaher Corp.</u>, 359 F. Supp. 2d 387, 391 (E.D.Pa. 2005)).

He also argues that we should apply a discovery rule to toll the running of the statute of limitations to the point where he was aware he had been injured.  Pl. Br. in Opp. at 47; <u>see also</u> <u>Melley v. Pioneer Bank, N.A.</u>, 834 A.2d 1191, 1201 (Pa. Super. Ct. 2003).  The discovery rule is a "judicially created device which tolls the running of the applicable statute of limitations until

the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct." Morgan v. Petroleum Products Equipment Co., 92 A.3d 823, 828 (Pa. Super. Ct. 2014) (internal citation and quotation marks omitted). Pennsylvania recognizes a discovery rule in breach of contract cases. When the discovery rule applies, "the point at which the complaining party should reasonably be aware that he has suffered an injury is a factual issue best determined by the collective judgment, wisdom and experience of jurors." Crouse v. Cyclops Indus., 745 A.2d 606, 611 (Pa. 2000) (internal quotations and citations omitted).

Creghan contends the "cryptic question and answer" in his deposition is not an admission that he knew -- even as the Mitchell partnership launched in March of 2008 -- that "Procura would not honor its contract to pay his commission when revenues would be generated in the future." Pl. Br. in Opp. at 48. He also points to the parties' October 29, 2013 tolling agreement under which they agreed to toll any statute of limitations from that date until thirty-one days after written notice of termination. Id. at 30, 31. Creghan's attorneys terminated the tolling agreement on February 19, 2014. Id. at 31.

Procura contends in reply that the tolling agreement does not save his claim because it tolls the statute as of October 29, 2013 -- more than five years after the date it argues the statute of limitations began to run. Def. Reply at 5 n.8.

We are not persuaded by Procura's argument. While Creghan's claims relate to new business, we find Ryncavage inapposite. Procura never notified Creghan that it intended to change his commission -- indeed, there is ample evidence that it repeatedly shifted terms without informing him beforehand. Likewise, there is ample evidence in the record that accounts took months and sometimes years to land. For example, Gilmartin, Creghan's counterpart from

Mitchell, testified that the typical sales cycle varied by the size of the client, "but at the short end of the period, it would be six months.  At the far end, it could be 18 to 24 months."  Pl. Br. in Opp., at Ex. 10 at 35:18-20).  Finally, Creghan and Fortunato corresponded in 2009 and 2010 about "Mitchell not paying" and "No Mitchell.  That is unreal,", Pl. Br. in Opp. at Ex. 25, -- further evidence that Creghan expected some Mitchell-related commissions well after March of 2008.

Accordingly, we conclude that the point at which Creghan should have been aware that he had suffered an injury is a factual issue for a jury to resolve.

## IV.    Conclusion

In accordance with the foregoing, we will deny Creghan's motion for summary judgment as to Procura's counterclaim.  We will grant in part and deny in part Procura's motion for summary judgment or, in the alternative, for partial summary judgment.

An appropriate Order follows.

ENTERED

MAR – 9 2015

CLERK OF COURT

3|9|15 mal.

Mattioni